ORIGINAL

Approved: _Cecilia Vogel_____
THANE REHN/CECILIA VOGEL
Assistant United States Attorneys

Before:   THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v. -

JAMSHED RAHMATOV,

                              Defendant.

- - - - - - - - - - - - - - - - - X

## 22 MAG 1340

**COMPLAINT**

Violations of
18 U.S.C. §§ 1951 and
1956

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

Zachary Carroll, being duly sworn, deposes and says that he is a Special Agent with Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE

(Hobbs Act Extortion)

1.   On or about February 8, 2022, in the Southern District of New York and elsewhere, JAMSHED RAHMATOV, the defendant, unlawfully and knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in 18 U.S.C. § 1951(b)(3), to wit, RAHMATOV used threats of force and actual physical force to attempt to obtain from the Victim $200,000 in crime proceeds that RAHMATOV believed were held in the Victim's bank account and which RAHMATOV had previously provided to a confidential source for the purpose of laundering the funds.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT TWO

(Money Laundering)

2.    In or about February 2022, in the Southern District of New York and elsewhere, JAMSHED RAHMATOV, the defendant, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit healthcare fraud, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.    I am a Special Agent with FBI and I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with witnesses and other law enforcement agents, and my review of bank records and websites.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## The Investigation

4.    Since in or about 2020, the FBI has been investigating a money laundering network that primarily launders healthcare fraud proceeds (the "Money Laundering Network").  In connection with this investigation, a grand jury in this District indicted several individuals for, among other things, conspiracy to commit money laundering, conspiracy to operate an unlicensed money transmitting business, and bank fraud, in *United States v. Rasulov, et al.*, No. 20 Cr. 653 (RA).  In a separate case, other individuals were indicted in the Eastern

2

District of New York for the underlying healthcare fraud in *United States v. Peter Khaim, et al.*, 20 Cr. 580 (AMD). The FBI continues to investigate the ongoing operations of the Money Laundering Network.

5. During its investigation, the FBI learned that the Money Laundering Network typically deposits checks from healthcare companies that represent healthcare fraud proceeds into New York based bank accounts held by shell companies. The individuals controlling the shell companies collect cash typically from U.S.-based individuals who want to remit funds to Uzbekistan through unlicensed channels. The individuals controlling the shell companies provide that cash, minus a fee, to the individuals providing the healthcare checks. The individuals controlling the shell companies typically wire the check deposit proceeds from the shell companies to Chinese companies to purchase goods from the Chinese companies. The Chinese companies ship the goods to importers in Uzbekistan. The importers would pay the Uzbekistan-based partners of the individuals operating the shell companies in U.S. Currency for the goods. Those Uzbekistan-based partners would then give the U.S. currency to the families and friends of the individuals who had provided the cash in New York.

6. During this same investigation, the FBI arrested an individual who later became a confidential source ("CS-1").[1] Prior to CS-1's arrest, CS-1 operated an unlicensed money transmitting business and participated in the Money Laundering Network. CS-1 laundered healthcare fraud proceeds by working with others to accept checks from healthcare companies, in exchange for the checks providing cash collected from New York-based individuals wishing to send remittances, coordinating the deposit of those checks into shell companies, facilitating transfers from the shell companies to Chinese companies, and partnering with individuals in Uzbekistan to deliver U.S. currency to the remittance recipients. CS-1 conspired with the

---

[1] CS-1 has pled guilty pursuant to a cooperation agreement to conspiracy to operate an unlicensed money transmitting business, conspiracy to commit money laundering, and conspiracy to commit bank fraud. CS-1 is cooperating with law enforcement in the hope of obtaining leniency at sentencing. To date, information received from CS-1 has proven reliable and has at times been corroborated by independent sources of evidence.

defendants charged in *United States v. Rasulov, et al.,* to operate the Money Laundering Network.

7.    CS-1 also provided promotional money laundering services to a human smuggling operation that helped individuals from Central Asia travel from Central Asia to Mexico and then illegally cross the border into the United States (the "Smuggling Network"). Typically, CS-1 received cash payments in New York from U.S.-based family members of Central Asian nationals wanting to illegally enter the United States, and CS-1 transmitted those funds primarily to Russia through unlicensed channels, where the funds were used to pay human smuggling fees.

8.    With the assistance of CS-1, the FBI investigated the Smuggling Network. During its investigation, the FBI learned that the Smuggling Network smuggled JAMSHED RAHMATOV, the defendant, and his family members, into the United States via Mexico in or about January 2021, and that, in exchange for a fee, CS-1 collected human smuggling fees in New York on RAHMATOV's behalf and transmitted the payments to Russia. CS-1 had various recorded calls with RAHMATOV and the operators of the Smuggling Network regarding the smuggling of RAHMATOV and his family and the collection and transfer of the smuggling fees.

9.    Between in or about November 2021 and January 2022, while residing in Brooklyn, RAHMATOV participated in several voluntarily interviews with the FBI. RAHMATOV informed the FBI, in substance and in part, that RAHMATOV and his family had been smuggled into the United States across the U.S.-Mexico border by the Smuggling Network and that subsequently RAHMATOV recruited other individuals from Central Asia to be illegally smuggled to the United States. According to RAHMATOV, CS-1 and RAHMATOV knew each other prior to CS-1 and RAHMATOV's immigration to the United States.[2]

10.    In addition, during these interviews, RAHMATOV indicated that he was familiar with laundering operations like the Money Laundering Network. RAHMATOV described, in substance and in part, that another individual was collecting smuggling fees in the United States ("Money Launderer-1"), depositing the fees into U.S. bank accounts, and wiring the funds to companies in China to purchase goods. Just as in the case of the Money Laundering Network, RAHMATOV described, in substance and in

---

[2] The FBI interviews with RAHMATOV were conducted with the assistance of a Russian interpreter.

part, that the Chinese companies shipped goods to importers in Uzbekistan, and the Uzbekistan-based importers provided U.S. Currency to Money Launderer-1's partners in Uzbekistan. RAHMATOV explained, in substance, that the importers thus avoided paying higher tariffs in Uzbekistan for the imports, and companies in China did not care about the source of the payments for goods.

11.   Based on information provided by CS-1, I have learned that on several occasions JAMSHED RAHMATOV has asked CS-1, in substance, whether CS-1 is able to send money abroad through unlicensed channels.  On at least one occasion, RAHMATOV asked CS-1, in substance, whether CS-1 could transfer to accounts abroad $1.5 million that RAHMATOV had stolen.

<u>$200,000 in Pharmacy Checks</u>

12.   Based on information provided by CS-1, I have learned, in substance and in part, that on or about January 30, 2022, JAMSHED RAHMATOV, the defendant, provided CS-1 with three checks totaling $200,000 from a pharmacy located in Manhattan ("Pharmacy-1").  The recipient line on the Pharmacy-1 checks was blank.  RAHMATOV asked CS-1, in substance and in part, to deposit the checks into a bank account and remit the funds abroad.  CS-1 accepted the checks from RAHMATOV.  RAHMATOV provided CS-1 with foreign bank account information to wire the funds to a company in China, a company in Latvia, and a company in Bangladesh (the "Foreign Companies"). RAHMATOV agreed to pay a fee to transfer the funds. RAHMATOV told CS-1, in substance, that the Pharmacy-1 checks came from a person CS-1 knew. RAHMATOV represented to CS-1, in substance, that RAHMATOV would ultimately be able to provide CS-1 with approximately $1 million per week in checks to transfer funds abroad.

13.   CS-1 informed law enforcement agents regarding the interaction with RAHMATOV and provided law enforcement agents with the Pharmacy-1 checks. Law enforcement agents authorized CS-1 to continue transacting with RAHMATOV to further the investigation and instructed CS-1 to tell RAHMATOV that the checks would be deposited and the funds would be remitted to the foreign companies, as RAHMATOV had requested.

14.   The Pharmacy-1 checks list an address in Manhattan as the address of Pharmacy-1.  Based on my review of publicly available online sources, I have learned that Pharmacy-1 is in Manhattan.  Based on my review of travel records and bank records, I have learned that the account holder of Pharmacy-1's

bank account was not in the United States at the time Pharmacy-1's bank account was opened.  During the investigation into the Money Laundering Network, I have learned that operators of the Money Laundering Network frequently open bank accounts using the identities of individuals not in the United States.

15.  Based on my review of Medicare billing data for Pharmacy-1 for the period from approximately January 2020 to February 1, 2022, as well as my training and experience, I have learned that Pharmacy-1 fills a disproportionally high volume of prescriptions for a number of expensive HIV medications and that the highest volume of prescriptions filled by Pharmacy-1 are these HIV medications.  For example, Medicare billing records show that over approximately 86% of Pharmacy-1's total Medicare payments are for approximately eleven of these HIV medications. Based on my training and experience, I have learned that these HIV medications are frequently used in fraudulent insurance billing schemes.

16.  Based on information provided by CS-1, I have learned that JAMSHED RAHMATOV, the defendant, works as a parking valet in Brooklyn.  Based on its investigation, the FBI has not identified any legitimate relationship between RAHMATOV and Pharmacy-1.

17.  Based on my training, experience, and involvement in the investigation, and the information provided above, I believe the Pharmacy-1 checks JAMSHED RAHMATOV, the defendant, provided to CS-1 are healthcare fraud proceeds, and that RAHMATOV was seeking to launder the crime proceeds using the Money Laundering Network by transmitting the proceeds abroad.  The transaction proposed by RAHMATOV to CS-1 involving the Pharmacy-1 checks is consistent with other laundering transactions conducted by the Money Laundering Network, as described above in paragraphs five and six.

18.  On or about February 1, 2022, CS-1 deposited the Pharmacy-1 checks into a covert FBI bank account held in Manhattan in the name of a covert FBI company.

19.  Based on information provided by CS-1, I learned that, after CS-1 deposited the Pharmacy-1 checks, JAMSHED RAHMATOV, the defendant, began pressing CS-1, in substance, to transfer the funds from the Pharmacy-1 checks to the foreign companies. RAHMATOV pushed CS-1, in substance, on multiple occasions, to execute the transfer as soon as possible.

20.   Based on information provided by CS-1, I learned that on or about February 4, 2022, CS-1 told JAMSHED RAHMATOV, the defendant, in substance, that CS-1 had given the Pharmacy-1 checks to another individual to deposit in that individual's bank account and that the individual would transfer the funds to the Foreign Companies. CS-1 only provided RAHMATOV with a first name for the individual.[3]   CS-1 also later told RAHMATOV that the bank account was frozen.

<u>Threats and Violence on February 8</u>

21.   As of February 8, 2022, the FBI had not transferred the deposited funds from the Pharmacy-1 checks to the foreign companies.

22.   On or about February 8, 2022, an individual who is a confidential source for the FBI ("CS-2")[4] reported to the FBI that CS-2 witnessed JAMSHED RAHMATOV, the defendant, assault an individual ("the Victim") with a baseball bat that same day. Based on another FBI agent's conversations with CS-2, I have learned the following, in substance and in part:

a.   On or about the morning of February 8, 2022, CS-2 was with the Victim in Manhattan. While in the presence of CS-2, the Victim received a phone call from JAMSHED RAHMATOV, the defendant. After the phone call, the Victim told CS-2, in substance and in part, that RAHMATOV had said he was waiting outside of the Victim's residence in Brooklyn and that he would kidnap the Victim's wife and child if the Victim did not give RAHMATOV his money. The Victim informed CS-2, in substance, that the Victim needed to go to Brooklyn to handle the situation. CS-2 volunteered to accompany the Victim. CS-2 drove with the Victim in CS-2's vehicle to the vicinity of Ditmas Avenue in Brooklyn, a busy commercial and residential street, to meet RAHMATOV.

b.   While CS-2 parked the vehicle, CS-2 observed the Victim approach JAMSHED RAHMATOV, the defendant, and RAHMATOV

_____

[3] On or about February 1 and February 5, 2022, FBI agents admonished CS-1 not to provide JAMSHED RAHMATOV with the name of a third-party involved in depositing and transferring the Pharmacy-1 checks. CS-1 nevertheless provided a first name to RAHMATOV.

[4] CS-2 is a paid informant. To date, information provided by CS-2 has been reliable and corroborated by independent evidence.

and the Victim began a physical fight.  CS-2 approached RAHMATOV and the Victim to de-escalate the situation and suggested that they all talk in CS-2's vehicle.

c.   CS-2, the Victim, JAMSHED RAHMATOV, and another individual accompanying RAHMATOV ("Individual-1") moved to CS-2's vehicle to continue the conversation. Once in the vehicle, RAHMATOV and the Victim were soon physically fighting.  CS-2 observed RAHMATOV holding what appeared to be a box-cutter and attempt to stab the Victim.  CS-2 stopped RAHMATOV by grabbing his hand.  The fight spilled back onto the street.

d.   Once on the street, CS-2 observed Individual-1 hand JAMSHED RAHMATOV a baseball bat, and CS-2 observed RAHMATOV chase the Victim and hit the Victim more than once with the baseball bat.  RAHMATOV continued to chase the Victim in the street.  The Victim fell, and RAHMATOV attempted to hit the Victim in the head with the baseball bat, but RAHMATOV made contact with the Victim's arm.

e.   CS-2 broke the fight, and RAHMATOV and Individual-1 left the scene.  CS-2 called 911 at approximately 9:28 a.m.  RAHMATOV and Individual-1 left the baseball bat behind.  CS-2 observed Individual-1 return to the scene and collect the baseball bat. I have reviewed photographs provided by CS-2 that show a baseball bat on the ground and Individual-1 picking up an object from the street. An ambulance transported the Victim to the hospital.

23.  On or about February 8, 2022, I obtained surveillance video capturing the location on Ditmas Avenue where the fight took place that same day.  Based on my review of the surveillance video, I have learned the following, in substance and in part:

a.   JAMSHED RAHMATOV, the defendant, and Individual-1 were parked in a vehicle on the street.  The Victim and CS-2 arrived in another vehicle and parked nearby.

b.   The Victim exited CS-2's vehicle and approached RAHMATOV's vehicle.  The Victim and RAHMATOV appear to argue and began physically fighting.

c.   The Victim, CS-2, and RAHMATOV, entered the vehicle of CS-2. Shortly thereafter, all parties exited the vehicle.  Individual-1 reappeared in the video carrying a baseball bat and hit the Victim once with the bat.  Individual-1

8

gave the baseball bat to RAHMATOV, who hit the Victim twice with the baseball bat.  RAHMATOV chased the Victim in the street. The Victim fell, and RAHMATOV struck the Victim with the bat. CS-2 pushed RAHMATOV away as RAHMATOV was striking the Victim, who lay on the ground.

        d.   RAHMATOV and Individual-1 left the scene.

24.  Based on my review of a New York City Police Department ("NYPD") report, I have learned that on or about February 8, 2022, at approximately 9:38 a.m., the NYPD responded to a 911 call in the vicinity of Ditmas Avenue in Brooklyn. According to the report, the Victim told NYPD officers, in substance, that JAMSHED RAHMATOV, the defendant, hit the Victim twice on the arm with a baseball bat causing pain.  The Victim was subsequently transported to a hospital.

### Obstruction and Post-Arrest Statement

25.  Based on information provided by CS-1, I have learned, in substance and in part, that in or about the morning of February 8, 2022, JAMSHED RAHMATOV, the defendant, and CS-1 had a recorded call.[5]  During the call, RAHMATOV told CS-1, in substance and in part, that RAHMATOV had beat up the Victim with a baseball bat because the Victim had taken RAHMATOV's money. RAHMATOV stated, in substance, that he would have killed the Victim if CS-2 had not been there. RAHMATOV urged CS-1 to convince the Victim not to report the assault to the police.  In addition, RAHMATOV stated, in substance and in part, that he wanted to pick up the Victim from the hospital and go to the bank with the Victim to wire the money, referring to the Pharmacy-1 deposited checks and the wire to the Foreign Companies.

26.  The FBI arrested JAMSHED RAHMATOV, the defendant, the evening of February 8, 2022.  FBI agents read RAHMATOV his *Miranda* rights, which RAHMATOV waived.  During his post-arrest statement, RAHMATOV claimed, in substance and in part, that he found the Pharmacy-1 checks on the floor at a restaurant and deposited them because he needed the money.[6]

---

[5] The recorded call was in Tajik, and the FBI is in the process of obtaining a draft English translation.

[6] A Russian interpreter translated the interview and reading of the *Miranda* rights.

WHEREFORE, deponent respectfully requests that JAMSHED RAHMATOV, the defendant, be imprisoned or bailed, as the case may be.

Special Agent Zachary Carroll
Federal Bureau of Investigation

Sworn to before me this
___9th___ day of February, 2022

THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK